IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

IN RE: JIMMY DEAN KINNEY, DEBTOR          CASE NO.: 1:20-bk-70361
                                             CHAPTER 7

FINISHING TOUCH CARPET ONE              PLAINTIFF

V.                           AP NO.: 1:20-ap-07029

JIMMY DEAN KINNEY                         DEFENDANT

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is a *Complaint Objecting to Discharge* ("Complaint") filed by Finishing Touch Carpet One ("Finishing Touch"), by and through its attorneys, Streetman & Gibson, PLLC, and an *Answer to Complaint Objecting to Discharge* filed by the debtor, Jimmy Dean Kinney ("debtor"), by and through his attorney, Billy J. Hubbell. Also, before the court is the debtor's *Motion to Convert to Chapter 13* ("Motion to Convert") and Finishing Touch's *Objection to Motion to Convert to Chapter 13*, each filed by the same attorneys. The court combined and heard both matters on October 15, 2020. Each party appeared personally and by and through their attorney. For the reasons stated herein, the Motion to Convert is denied. The relief requested in the Complaint is granted. The court will enter a separate judgment denying the debtor his Chapter 7 discharge.

### I.  Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (J), and (O). The following opinion and order constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Findings of Fact

Prior to trial, the debtor filed his Motion to Convert to either reorganize or simply avoid the potential consequences of a section 727 discharge action. Finishing Touch objected arguing a bad faith conversion. Because the bad faith and discharge allegations mirror and complement each other, the parties agreed to try both issues at the same time. Finishing Touch initially sought to deny the debtor his discharge under sections 727(a)(2), (3), (4), (5), and (7). Without specifically abandoning any of its causes of action, counsel for Finishing Touch indicated in his opening statement that its case had devolved principally into a section 727(a)(4) action. Accordingly, the emphasis at trial was on whether the debtor had made a false oath or account on either his schedules or at his first meeting of creditors sufficient to deny him a discharge.

### A. Background

In the Fall of 2018, the debtor began a remodeling project at his home. He incurred debt to Finishing Touch primarily for items related to his kitchen. Two factors immediately combined to complicate the relationship: first, the debtor's account representative at Finishing Touch was also his stepson; second, the debtor believed he would owe Finishing Touch approximately $10,000 instead of almost $17,000, the actual charge. The debtor professed ignorance of in-house issues relative to the bid between the stepson/account representative and his employer. Succinctly, the account representative may have logged in the project at a discounted and, at least to Finishing Touch, unacceptable rate.

Despite demand, the debtor did not pay. Finishing Touch filed a Complaint in the Circuit Court of Ashley County, Arkansas, seeking damages in the amount of $16,973.70 on August 14, 2019. (Plaintiff's Ex. 1.) The Ashley County Circuit Court set the matter for trial on November 5, 2019. (Pl.'s Ex. 2.) Referencing the fact that debtor's counsel was "undergoing radiation," the

debtor moved for a continuance of the November trial on October 21, 2019.  (Pl.'s Ex. 3.)  The Ashley County Circuit Court reset the trial for February 11, 2020.  (Pl.'s Ex. 4.)  The debtor filed his Chapter 7 bankruptcy on February 7, 2020, thus mooting the state court trial setting.  He apparently qualified for a Chapter 7; his means test calculation reflected no presumption of abuse.  (Pl.'s Ex. 5, at 58.)

The debtor also filed his schedules on February 7, 2020.  (Pl.'s Ex. 5.)  He acknowledged participation in the preparation of his schedules—that he had reviewed and signed them under penalty of perjury.  (Pl.'s Ex. 5, at 6, 40, 52, 58.)  He listed real estate valued at $95,000 and personal property valued at $14,065 for a total of $109,065.  (Pl.'s Ex. 5, at 18.)  Creditors have liens on his home and vehicles.  (Pl.'s Ex. 5, at 21–23.)  The debtor indicated that he would exempt and retain a 2006 Dodge Dakota and his home and that he would enter into reaffirmation agreements accordingly.  (Pl.'s Ex. 5, at 53.)  The debtor indicated that he would also retain a 2016 Chevrolet Equinox and a 2016 Polaris Ranger.[1]  (Pl.'s Ex. 5, at 54.)  The debtor has no unsecured priority claims.  (Pl.'s Ex. 5, at 24.)  The debtor has unsecured claims totaling $21,419.60, of which Finishing Touch comprises the overwhelming majority at $16,973.  (Pl.'s Ex. 5, at 25–29.)  In sum, the debtor will emerge from bankruptcy having retained most, if not all, of his assets.  Equally, Finishing Touch is overwhelmingly the creditor most affected by the debtor's bankruptcy and discharge.

The predicate personal and contractual complications discussed above are not necessarily relevant to the debtor's conversion or discharge other than a reflection of the misunderstanding and perhaps acrimony between the parties.  This confusion may have contributed to Finishing

---

[1]  The debtor's Schedule C and Statement of Intention are not fully consistent in this regard though this matter was not fully developed at trial.  *See* Pl.'s Ex. 5, at 19–20, 54.

Touch's belief that the debtor had sufficient cash resources to make payment but employed every means possible to avoid doing so.  Concomitantly, Finishing Touch suggests this as a motive for the debtor's alleged failure to adequately complete his schedules.

Further complicating the parties' conflict, the debtor lost his job in October of 2019.  The debtor interposes this economic reversal as part of his defense.  Conversely, Finishing Touch focuses on two related cash events as relevant to the debtor's discharge: (1) the debtor's 401(k) plan liquidation in 2018 and (2) his severance pay received in November 2019, a few months before he filed bankruptcy.

Based on its belief that the debtor, pre-and post-petition, deliberately avoided paying Finishing Touch despite an ability to do so—and tailored his schedules accordingly, Finishing Touch objected to both his discharge and his last-minute effort to convert to a Chapter 13. Finishing Touch regards the latter as merely an effort to avoid the consequences of its objection to discharge rather than a legitimate effort to reorganize.

### B.  Schedules

#### 1.  Failure to Disclose Checking Accounts

The debtor checked "[n]o" on the category of "[d]eposits of money," which includes "[c]hecking, savings or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions."  (Pl.'s Ex. 5, at 11.)  Further, the debtor listed no accounts in the spaces provided for enumerating specific checking, savings, and other financial accounts.  (Pl.'s Ex. 5, at 11–12.)

These responses are inaccurate.  The debtor had a joint checking account with his wife at First State Bank in Crossett, Arkansas.  (Pl.'s Exs. 11–13.)  The account was open pre-filing and remained open post-filing through at least February 26, 2020, with a balance of $4.60 as of that

4

date.  (Defendant's Ex. 17.)  As discussed in more detail below, the account was active, rather than dormant, in the Fall of 2019.

The debtor also had a joint checking/share account with his wife at Timberline Federal Credit Union.  (Def.'s Ex. 18.)  That account remained open through at least March 31, 2020, albeit with a concluding balance of $5.00.  (Def.'s Ex. 18.)  The record does not reflect an exact balance on February 7, 2020.[2]  (Def.'s Ex. 18.)

The debtor's wife, Martha Kinney, had another checking/share account solely in her name at Timberline Federal Credit Union.  (Pl.'s Exs. 14–16.)  The debtor testified that, while not a signatory to the account, he did deposit some of his money into that account and both held and used her debit card on that account.  These deposits were not insignificant.  On October 17, 2018, the debtor deposited $40,000 into this account after liquidating his 401(k) plan, which is discussed in more detail below.  (Pl.'s Ex. 14.)  The debtor's wife testified, and her only explanation as to why the $40,000 was deposited into her account was because of the debtor's access to and use of the debit card.  The debtor testified, and the records reflect, that other miscellaneous but generally unquantified deposits of his funds were made into that account.  Though pressed, the debtor was not specific as to amounts or in identifying deposits into that account.  The debtor did not disclose his depository and withdrawal enjoyment of this account on his schedules.  On neither his schedules nor at trial did the debtor ever offer a fully credible explanation for why he used his funds and transacted personal business from that account rather than from accounts in his name.

---

[2] Presumably, the balance would have been $5.00 as surmised from the fact that no transactions occurred between January 11, 2020, and March 31, 2020.

### 2. Unreported Cash

Prior to losing his job in October of 2019, the debtor was a long-time hourly employee at Georgia-Pacific.  He had a relatively stable income, a 401(k) plan, and accrued vacation.  His wife received $806 a month in Social Security benefits.  (Pl.'s Ex. 5, at 33.)  Collectively, they had accumulated a home, vehicles, and related consumer assets.  On his schedules, the debtor responded "[n]o" under the category of "[c]ash," which includes "[m]oney you have in your wallet, in your home, in a safe deposit box, and on hand when you file[d] your petition."  (Pl.'s Ex 5, at 11.)  The debtor did, however, subsequently disclose $400 in cash under a catchall provision.  *See* "Part 7: Describe All Property You Own or Have an Interest in That You Did Not List Above." (Pl.'s Ex. 5, at 18.)

Finishing Touch argues that the debtor actually had more cash on hand when he filed bankruptcy in February of 2020.  In support, Finishing Touch points to two significant cash events. The first is the debtor liquidating his 401(k) plan in 2018.  The second is the debtor's Fall 2019 income, accumulated vacation pay, and severance from his employer, Georgia-Pacific.

### a. The 401(k) Liquidation

The debtor obtained a distribution from his 401(k) plan on October 8, 2018, in the gross amount of $59,179.13.  (Pl.'s Ex. 10, 10-A.)  State and federal withholding resulted in a net cash amount to the debtor of $44,384.34.  (Pl.'s Ex. 10-A.)  The debtor testified that at the time he had no inkling his job might be in jeopardy.

Shortly thereafter, there was a $40,000 deposit on October 17, 2018, into Martha Kinney's account at Timberline Federal Credit Union.  (Pl.'s Ex. 14.)  This deposit was from the plan distribution.

At trial, the debtor was unclear as to what happened to this money. He explained that $10,000 went for a funeral. In response to questions from his counsel, the debtor indicated that he had pulled out $10,000 for a funeral in 2016. The exhibit reflects that the actual loan date was September 18, 2015. (Pl. Ex. 9, at 2.) This earlier loan would certainly not impact disposition of the 2018 liquidation. The debtor also testified that he liquidated his 401(k) in 2018 to effect the repairs on his house, which involved more than just his kitchen and Finishing Touch. He testified that the floors were rotten and had to be replaced, the house had moisture issues, he remodeled the kitchen, and he bought a pellet stove to heat the house.

In conclusion, the debtor testified that by July of 2019 he did not have any of the 401(k) proceeds left. No evidence exists that would meaningfully suggest otherwise. In fact, the debtor testified that his 401(k) statement for December 31, 2019, reflected that he owed more on a loan, $3,544.96,[3] than the closing balance of $1,039.91. (Pl.'s Ex. 9.)

Succinctly stated, the debtor's 401(k) plan liquidation does not inform this court's consideration of the debtor's cash position at the time of filing. While the liquidation in 2018 might factor into other disclosure categories discussed herein, the lack of credible evidence that these funds were extant past mid-summer 2019 results in this court disregarding any of the 401(k) liquidation proceeds from its analysis of any unreported cash at the time of filing, February 2020.

b. Fall of 2019

Georgia-Pacific announced in June 2019 that there would be significant local layoffs. According to the debtor, Georgia-Pacific then got "wishy washy" and uncertainty resulted. The debtor acknowledged that he told Finishing Touch in June that he expected an October severance. However, the actual decision to retire, which according to the debtor was involuntary, occurred

---

[3] The record reflects that this represents the balance on the funeral loan.

around October 17 or 18, 2019.  Around that date, Georgia-Pacific informed him that October 26 would be his last day.  The debtor testified that only then was he certain that his job was over, and a severance would be forthcoming.  At about the same time, the debtor was already contemplating bankruptcy, and he obtained his prerequisite credit counseling on October 13, 2019.  (Pl.'s  Ex. 17.)  He testified that it was taking a long time to get all the documentation together, so he decided to go ahead and take the course.

Thus, by mid-October 2019, at the latest, the debtor was preparing to file bankruptcy.  He also knew that his job was ending October 26.  Further, he testified at trial that he was aware then that he would be without income until April 2020 when his pension payments began.  It is under those conditions that the fact question presents itself of whether the debtor had more than his scheduled $400 in cash at the time he filed on February 7, 2020.

An analysis of his undisclosed bank accounts becomes pertinent in determining his available cash resources.  On September 26, 2019, the debtor's joint account at First State Bank had a $3.83 balance.  (Pl.'s Ex. 11.)  Deposits and withdrawals/debit cards resulted in a $968.07 balance as of October 25, 2019.  (Pl.'s Ex. 11.)  The two largest deposits were from Georgia-Pacific and represented accrued vacation and half a payroll check.  The debtor's last day of employment was October 26.  The statement notes four cash withdrawals during the month totaling $4,754.85—$777.22 and $2,400 on September 27; $277.63 and $1,300 on October 11.[4]  (Pl.'s Ex. 11.)

The October 25, 2019 ending balance of $968.07 changed significantly in the following month, as reflected in a bank statement showing an ending balance of $13,488.61 as of November 26, 2019.  (Pl.'s Ex. 12.)  On November 22, 2019, a $16,727.35 deposit was made representing the

---

[4] These four cash withdrawals total 99.1% of the withdrawals for that month.

lion's share of $20,692.15 in aggregate deposits.  (Pl.'s Ex. 12.)  The $16,727.35 amount is the debtor's net severance pay.  (Pl.'s Ex. 6-C.)  Additionally, a $3,325.87 deposit was made on November 8, 2019, which the debtor testified included accrued vacation from Georgia-Pacific. (Pl.'s Ex. 12.)  The record is unclear how that number fits in or can be reconciled with a similar sum received on September 27, 2019.  (Pl.'s Ex. 11.)  Against deposits, the debtor again made several cash withdrawals totaling $8,132.48—$150 and $777.22 on October 29; $600 on November 1; $50 on November 6; $3,277.63 on November 8; $277.63 and $3,000.00 on November 25.  (Pl.'s Ex. 12.)

As of November 26, 2019, the debtor's account balance was $13,488.61.  (Pl.'s Ex. 13.) The debtor made two cash withdrawals totaling $13,277.63—$13,000.00 on November 27 and $277.63 on December 16.  (Pl.'s Ex. 13.)  One other debit in the amount of $186.84 to Martin Tire along with some miscellaneous debit card entries resulted in an ending balance of $4.60 on December 26, 2019.  (Pl.'s Ex. 13.)

Facially, the debtor's main joint banking account was exhausted by the end of 2019 and certainly before his February 2020 bankruptcy filing.  However, the debtor withdrew a total of $26,164.96 in cash from the same joint checking account between September 26, 2019, and December 26, 2019.  Finishing Touch asserts that all or part of this sum remained in the debtor's possession at filing with the debtor purposefully opting not to disclose the money on his schedules to avoid paying his creditors and afford himself income during this fallow period.

The validity of that assertion requires a more exacting analysis of the record to lend clarity, or at least a quantification, to the debtor's supposed financial situation at filing.  Although not fully developed at trial, but certainly critical to a balanced analysis, is the fact that the debtor had

ongoing expenses from November of 2019 (the first month after his employment ended) through February of 2020.  The record does provide some salient and dispositive facts in this regard.

Specifically, on his schedules, the debtor reported $4,197.68 a month in expenses against, presumably, no income after October 26, 2019, until April 2020, other than his last Georgia-Pacific paycheck(s), vacation pay, and severance.  (Pl.'s Ex. 5, at 36.)  That is a historical figure and permits a reasonable pre-bankruptcy analysis of the debtor's expenses.

The debtor's joint account at First State Bank is the appropriate starting point.  The October 25, 2019 bank statement reflects a $3.83 balance as of September 26, 2019.  (Pl.'s Ex. 11.)  On December 26, 2019, the ending balance in the same account was $4.60.  (Pl.'s Ex. 13.)  So, the debtor's October bank statement started with less than $5 in the bank and ended the year in equal fashion.  In between that time, which encompasses his job termination and his only source of income, the following deposits occurred:

| Date | Amount |
|------|--------|
| 9/27/19 | $3,222.05 |
| 10/11/19 | $1,663.41 |
| 10/25/19 | $872.76 |
| 11/1/19 | $638.93 |
| 11/8/19 | $3,325.87 |
| 11/22/19 | $16,727.35 |
| No December deposits | |
| TOTAL | $26,450.37 |

(Pl.'s Exs. 11–13.)

The debtor's joint expenses, unchallenged at trial, of $4,197.68 a month for October, November, and December equal $12,593.04.  The debtor testified that he received no income in

2020, an assertion repeated on his schedules.  (Pl.'s Ex. 5, at 42.)  Accordingly, that expense figure should also be extrapolated to include $4,197.68 in expenses for January of 2020 for a total of $16,790.72.  Adding $3,224 in income, representing his wife's $806 a month in Social Security for the same October 2019 through January 2020 period, results in income of $29,674.37 and expenses of $16,790.72.  Thus, approximately $13,000 in pre-petition cash withdrawn by the debtor is unaccounted for.

Also pertinent because of its proximity to his February 7, 2020 bankruptcy filing, the debtor emptied out the balance remaining in his 401(k) account by withdrawing $1,037.32 at some point between January 1 and March 31, 2020.  (Pl.'s Ex. 8.)  The debtor was unable to recall what he did with that money.  The same 401(k) account reflected minimal activity in the year prior to bankruptcy.  (Pl.'s Ex. 9.)  The debtor may have withdrawn some cash at an unspecified time during 2019, and he may have applied for forgiveness of a minimal amount against his 401(k) loan.  (Pl.'s Ex. 9.)  Regardless, the unaccounted-for cash over expenses is now in the $14,000 range.

When asked at trial what he spent the unaccounted-for cash on, the debtor initially testified, "I don't know."  He then referenced groceries, "stuff"—all presumably expense items already accounted for in his $4,197.68 monthly expense calculation.  Despite his testimony that he liked to pay some expenses in cash, his cash withdrawals *significantly* exceeded his presumably valid and scheduled historical monthly expenses.

More tellingly, the debtor also testified that the approximate $17,000 in severance is what he had to live on for six months—a period that bridged his employment termination in late October of 2019 and his pension commencing in April of 2020.  That admission does not square with the idea that he had almost no cash on the date of filing, February 7, 2020.  During his testimony, the

debtor acknowledged that on February 7 he had a little bit of cash that he was "living on." The debtor then intimated that he had gone through the entire amount by the time he filed his petition. The bank records, his historical expense calculations, the debtor's contradictory testimony, and a lack of quantification strongly suggest otherwise.

This disparity is perhaps partially explained by seven days of February living expenses, Christmas expenses the debtor estimated at $2,000, and other generally referenced, but insufficiently quantified, expenses. Additionally, the debtor vaguely quantified some deductions, such as a $1,500 attorneys fee for the bankruptcy and $400 in reported cash. However, the Disclosure of Compensation of Attorney for Debtor does not note the date of payment to his attorney. (Pl.'s Ex. 5, at 56.) Simply put, cash remained after the payment of historical expenses even if some miscellaneous and insufficiently quantified amounts are taken into consideration.

The debtor also indicated that he deposited some cash into his wife's Timberline Federal Credit Union account. He indicated that he sometimes used her debit card and that she had "stuff" (presumably bills) coming out of her account. This argument has three infirmities.

First, any debit for these generic expenses would presumably already be accounted for in the debtor's joint $4,197.68 monthly expense calculation. Second, the record does not meaningfully support this allegation from the few documents in evidence. In direct response to questions at trial about question number 17 concerning "[d]eposits of money," the debtor testified that he always puts money in his wife's account. (Pl.'s Ex. 5, at 11.) This assertion would seem inconsistent with the direct deposits from his employer into their joint account with some ambiguity left as to what he did with the cash withdrawals.

Third, his wife's Timberline Federal Credit Union statements from September 1, 2019, through March 31, 2020, do not meaningfully support the debtor's assertion in this regard. Besides

12

her Social Security income directly deposited into her account, very few other deposits were made other than $450 on September 13, 2019, $400 on September 27, 2019, two transfers of $270 and $200 on October 11, 2019, $1,000 on November 8, 2019, $1,000 on January 28, 2020, and $700 on March 13, 2020. (Def.'s Ex. 16.) No other entries explained, or otherwise quantified in the testimony, account for deposits from the debtor into his wife's account (and the record is not even clear that these deposits were from the debtor—they are simply unexplained other than a generic reference by the debtor that he deposited monies into his wife's account). Also, even if deposited into her account, the funds would presumably already be accounted for in their joint expense calculation. Further, if these transfers were from the debtor, he did not disclose them on his Statement of Financial Affairs. (Pl.'s Ex. 5, at 47.)

The debtor's wife was equally uncertain as to the source of some of these deposits.[5] The debtor introduced an exhibit reflecting the balance in the joint Timberline Federal Credit Union account from October 1, 2019, through March 31, 2020, but solely to reflect that there was only a $5 balance at the end of that period. (Def.'s Ex. 18, at 1, 4.) The debtor offered no explanation for any of the entries on this statement.

Other than his last checks from Georgia-Pacific discussed above—severance, vacation, final 401(k) liquidation, and pay—the debtor did not receive any other income from October of 2019 until April 6, 2020, when he became eligible to draw his pension. He did not look for another job because of his age and physical infirmities. By late October, the debtor also knew that he was contemplating bankruptcy, that he had lost his job, that he would be without income until April of 2020, and that a November 5 trial in the state court case filed by Finishing Touch was impending.

---

[5] Mrs. Kinney admittedly has some health issues that may have impacted her ability to fully testify.

The debtor candidly admitted that he knew the severance was what he would need to live on during the fallow period until his pension began in April of 2020.  A comparison of his Georgia-Pacific deposits at the end of 2019, his historical expenses, his cash withdrawals, his lack of reported and scheduled pre-petition transfers, and his unquantified explanations compel the finding that the debtor had anywhere from ten to twelve thousand in unexplained and unaccounted-for cash in his possession at the time of filing.  The lack of certainty is solely a function of the ambiguity resulting from the debtor's schedules and testimony.

### 3.  Pre-petition Transfers

On his Statement of Financial Affairs, the debtor indicated he had not in the two years prior to bankruptcy transferred "any property to anyone, other than property transferred in the ordinary course of [his] business or financial affairs."  (Pl.'s Ex. 5, at 47.)  Further, the debtor testified that he told his trustee at his section 341 meeting "no sir" when asked if he had transferred property to anyone in the three years before his bankruptcy.

These statements are incorrect.  The debtor deposited $40,000 in proceeds from his 401(k)-plan liquidation into the account solely in his wife's name at Timberline Federal Credit Union on October 17, 2018.  (Pl.'s Ex. 14.)  This transaction occurred within the two-year period prior to filing and should have been disclosed accordingly.  The debtor's wife testified that her only explanation to why the $40,000 was deposited in into her account was because the debtor had access to and sometimes used her debit card.  Additionally, as outlined above, the debtor made other unquantified transfers of cash to his wife's account as recently as two or three months before he filed, none of which appear on his schedules.

14

This conclusion does not suggest that in isolation anything was inherently wrong or fraudulent about these transactions.  The problem lies in the debtor's failure to disclose the transactions, thus hindering creditor or trustee scrutiny.

### 4. 401(k) Disclosure

On his schedules, the debtor indicated that he had no interest in an IRA or 401(k) account. (Pl.'s Ex. 5, at 13.)  The debtor's 401(k) plan Account Overview for the period from January 1, 2020, to March 31, 2020, reflects an opening balance of $1,039.91, a withdrawal of $1,037.32, fees and expenses of $4.84, resulting in a zero-closing balance.  (Pl.'s Ex. 8.)  The account statement is not clear, and the record did not clarify when the account went to a zero balance. Regardless, the account exists and should have been disclosed on the debtor's schedules.  The debtor failed to do so.  Once again, creditors and the Chapter 7 trustee were denied basic and bare minimum disclosures that typically inform subsequent scrutiny or analysis of the debtor's financial condition.

### 5. Fee Disclosure

On his Statement of Financial Affairs, the debtor answered "[n]o" to the question of whether he had paid or transferred property to anyone, defined to include attorneys, he consulted with about filing his petition.  (Pl.'s Ex. 5, at 47.)  Regardless, debtor's counsel disclosed on his Disclosure of Compensation of Attorney for Debtor that he had been paid $1,500 by the debtor prior to filing.  (Pl.'s Ex. 5, at 56.)  Again, no explanation was given for such a cavalier effort at preparing schedules with a minimal regard for accuracy.

6.  Misstating Income

The debtor testified that his employer, Georgia-Pacific, forcibly retired him and that October 26, 2019, was his last day.  Despite being unemployed on the date he filed his petition,[6] February 7, 2020, the debtor, on his Schedule I, listed monthly gross wages or salary of $4,867.46. (Pl.'s Ex. 5, at 32).  Additionally, he estimated overtime pay of $378.60 for a calculated gross monthly income of $5,246.06.  (Pl.'s Ex. 5, at 32).  Deductions resulted in a monthly take-home pay of $3,270.39.  (Pl.'s Ex. 5, at 33).  His non-filing spouse receives Social Security of $806 a month for an aggregate combined monthly income of $4,076.39.  (Pl.'s Ex. 5, at 33.)  On his schedules, the debtor indicated that he did not "expect an increase or decrease [of his income] within the year after [he] file[d] this form."  (Pl.'s Ex. 5, at 33.)  Against this reported, but nonexistent since November 2019 monthly income, the debtor interposed monthly expenses of $4,197.68 resulting in a negative $927.29 in "monthly net income."  (Pl.'s Ex. 5, at 36.)

These disclosures are simply a puzzler.  While the means test includes by definition calculations based upon income received over the six-month period prior to filing,[7] Schedule I is typically an accurate statement of current income, presumably supported by historical antecedents. Regardless, the entries are supposed to be accurate; it is incomprehensible that the debtor would list income that he simply was no longer receiving and had not received since October 2019. Additionally, it makes no sense that he would report that as his income without any indication that there was certainly a decrease not only presently but presumably for the near future.  Again, this simply represents an additional area where the debtor demonstrates a casual disregard for any accuracy at all in the completion of his schedules.

---

[6] *See* Plaintiff's Ex. 5, at 32, where the debtor checked the "[n]ot [e]mployed" box.
[7] *See* 11 U.S.C. § 101(10A) (2020); Pl.'s Ex. 5, at 57.

16

### III.  Analysis

A.  Bad Faith Conversion

Prior to examining the consequences, if any, of the above facts on his Chapter 7 discharge, the court must first determine if that analysis is appropriate given that the debtor filed his Motion to Convert.  The filing was done immediately prior to a previous trial setting on Finishing Touch's objection to the debtor's discharge and necessitated the combined hearing on both the Motion to Convert and the Complaint.

Finishing Touch asserts that the debtor's effort to belatedly convert to a Chapter 13 is a bad faith filing.  In support, Finishing Touch posits the timing of the debtor's filing in the context of its efforts to collect in state court and his last-minute effort to convert to a Chapter 13, which would obviate a section 727 objection to his discharge.

Specifically, Finishing Touch filed its initial state court complaint on August 14, 2019. Trial was set on November 5, 2019; however, it was continued at the debtor's request because of his lawyer's illness.  The trial was then reset on February 11, 2020; however, it was mooted by the debtor filing his bankruptcy petition on the eve of trial.  During that same time frame, the debtor lost his job but came into cash sufficient to pay Finishing Touch, yet refused to do so.  Thereafter, the debtor filed his Chapter 7 bankruptcy and reported only $400 in cash.  Despite reporting non-existent income on his Schedule I, the debtor otherwise passed the means test with no presumption of abuse.

Pursuant to 11 U.S.C. § 706(a), "[t]he debtor may convert a case under [Chapter 7] to a case under [C]hapter . . . 13 of this title at any time[.]"  11 U.S.C. § 706(a) (2020).  Nevertheless, "a case may not be converted to a case under [Chapter 13] unless the debtor may be a debtor under such chapter."  11 U.S.C. § 706(d) (2020).  In *Marrama v. Citizens Bank of Massachusetts*, the

17

United States Supreme Court found that a debtor's right to convert is not absolute, but rather, it is expressly conditioned on the debtor's "ability to qualify as a 'debtor' under Chapter 13." 549 U.S. 365, 372 (2007). Under 11 U.S.C § 1307(c), a court may dismiss a case under Chapter 13 for cause. 11 U.S.C § 1307(c) (2020).

> Bankruptcy courts . . . routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.' In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct . . . is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13.

*Marrama*, 549 U.S. at 373.

The record in this case compels the conclusion that conversion to a Chapter 13 is not appropriate for cause, including bad faith. Part of this finding is cumulative and based on the court's findings and conclusions above and below concerning the debtor's disclosures and completion of his schedules. The debtor filed a Chapter 7, and the juxtaposition of his "current monthly income," a calculation based on the six-month period prior to bankruptcy, and expenses under the means test resulted in a determination that no presumption of abuse existed. The debtor does not have a job; rather, he and his spouse live on a pension and Social Security. Only after being pursued on perhaps a well-founded objection to his discharge did he belatedly attempt to convert to a Chapter 13 and, as section 727 does not implicate the debtor's discharge in a Chapter 13, escape the consequences.

The debtor would presumably exit his Chapter 7 with almost all of his assets and a discharge of very little debt other than the amount owed to Finishing Touch. Clearly, his Chapter 7 was principally directed to no other creditor; now that Finishing Touch is pursuing his discharge, he seeks to convert to a Chapter 13 to avoid the consequences of his own misrepresentations in his schedules at the cost of a minimal to nothing distribution over three years. His actions, both pre-

and post-petition, reflect a deliberate effort to avoid paying Finishing Touch, putting cash beyond its reach, and employing bankruptcy to retain all of his disclosed assets, plus undisclosed cash obtained pre-petition—almost exclusively to the detriment of Finishing Touch, his principal unsecured creditor.

His effort to convert is in bad faith, and his Motion to Convert is denied.  Accordingly, the debtor remains in a Chapter 7, and Finishing Touch is entitled to consideration of the bases alleged in its Complaint for denial of the debtor's discharge.

### B.  Discharge

*Ab initio*, the debtor's bankruptcy is a bit of a puzzler.  Unquestionably, the debtor suffered a financial reverse with the loss of his job, foreshadowed in June 2019 and conclusively terminated in October 2019.  Clearly at or about that time, the debtor was in the process of obtaining his credit counseling and contemplating bankruptcy.  The debtor did not, however, file until February of the following year.  When he did file, his Chapter 7 bankruptcy inordinately had very little effect on him, his spouse, or anyone else other than Finishing Touch.  Specifically, a review of his schedules reflects that the debtor would emerge from a Chapter 7 proceeding with all his disclosed assets.  Any creditors holding liens on those assets will be paid their reaffirmed debt.  The debtor listed no priority debt; there is only unsecured debt remaining.  In turn, the debtor would discharge $21,419.60 in unsecured debt, of which only $4,446.60 is debt other than to Finishing Touch.

But for Finishing Touch's objection to his discharge, that is exactly what would have happened.  Accordingly, the question becomes whether the debtor fully and properly disclosed his financial picture sufficiently to earn his discharge, or did the debtor misrepresent and occlude his financial circumstances in an effort to benefit both from the discharge and the retention of, in this instance, principally cash.

19

Pursuant to section 727(a)(4)(A), "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A) (2020). "To deny a discharge under 11 U.S.C. § 727(a)(4)(A), the plaintiff must establish the following elements: 1. the debtor made the statement under oath; 2. the statement was false; 3. the statement was made with fraudulent intent; 4. the debtor knew the statement was false; and 5. the statement related materially to the debtor's bankruptcy." *Wetzel v. Eichler* (*In re Eichler*), 599 B.R. 31, 45–46 (Bankr. E.D. Ark. 2019) (citing *Helena Chemical Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 307 (Bankr. E.D. Ark. 2010)).

"Denial of a discharge is a harsh remedy and § 727 is to be strictly construed in favor of the debtor." *Home Service Oil Co. v. Cecil* (*In re Cecil*), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citing *Kaler v. Charles* (*In re Charles*), 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012)). "'Importantly, however, § 727 was also included to prevent the debtor's abuse of the Bankruptcy Code.'" *Id.* "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence." *Charles*, 474 B.R. at 683–84.

"'For [] a false oath or account to bar a discharge, the false statement must be both material and made with intent." *Eichler* 599 B.R. at 46 (citing *Korte v. U.S. Internal Revenue Serv.* (*In re Korte*), 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001)). A matter is "material" if it "'bears a relationship to the bankrupt's business transactions or estate, or concerns discovery of assets, business dealings, or the existence and disposition of his property."' *Id.* "[I]ntent 'can be established by circumstantial evidence,' and 'statements made with reckless indifference to the truth are regarded as intentionally false.'" *Id.*

"It is well established that, because statements made by a debtor in his schedules and statements, and at his meeting of creditors, are signed under pains and penalties of perjury, they

20

constitute 'oaths' for the purposes of § 727(a)(4)(A)." *Charles*, 474 B.R. at 684 (citing *Korte*, 262 B.R. at 474).

> As § 727(a)(4)(A) makes clear, the [Bankruptcy] Code requires nothing less than a full and complete disclosure of any and all apparent interest of any kind. The debtor's petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.

*Cecil*, 542 B.R. at 453–54 (citing *Korte*, 262 B.R. at 474).

"Full disclosure is required, not only to ensure that creditors receive everything they are entitled to receive under the Bankruptcy Code, but also to give the bankruptcy system credibility and make it function properly and smoothly[.]" *Cecil*, 542 B.R. at 453.

> Bankruptcy provides debtors with a great benefit: the discharge of debts. The price a debtor must pay for that benefit is honesty and candor. If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge.

*Cecil*, 542 B.R. at 454 (citing *Ellsworth v. Bauder* (*In re Bauder*), 333 B.R. 828, 834 (B.A.P. 8th Cir. 2005) (Schermer, J. dissenting).

As stated above, the debtor's Chapter 7 serves no real purpose other than to discharge the debtor's debt to his principal unsecured creditor, Finishing Touch. Consistent with that singular focus, the debtor's schedules provide little assistance in fully developing or clarifying the debtor's past or current financial circumstances. Specifically, the facts compel the conclusion that the debtor made false oaths or accounts on his schedules, in some instances in reckless disregard for the truth and in other instances with specific intent to disguise the truth.

### 1. Checking Accounts

The debtor reported that he had no checking or depository accounts, including any share accounts with any credit union, at the time of filing. That is incorrect. The debtor had a joint checking account with his wife at First State Bank and a joint account with his wife at Timberline

Federal Credit Union.  He also actively used his wife's individual share account with Timberline Federal Credit Union; he used her debit card on the account and deposited his money into her account.

Albeit with minimal balances when he filed, creditors and his Chapter 7 trustee had a right to any information about the debtor's accounts so that they might examine pre-bankruptcy transactions and historical data, including income, expenses, potential preferences, and possibly avoidable transfers.  Further and significantly, checking account statements often provide a solid baseline for analyzing issues related to dischargeability or the debtor's discharge.  Here, the debtor inexplicably and deliberately denied interested parties that opportunity.  Frankly, it is difficult to understand why any debtor would simply omit listing his current checking accounts.  But that is exactly what this debtor did and in doing so denied his creditors one of the fundamental mediums by which to gauge the entirety of a Chapter 7 debtor's financial circumstances.

### 2.  Unreported Cash

Despite having two checking accounts and a third one that he freely used, the debtor omitted the checking accounts and testified that he generally liked to pay his bills in cash.  On his schedules, he disclosed that he had $400 in cash on hand not otherwise listed.  (Pl.'s Ex. 5, at 18.) That amount roughly approximates the $400 balance in his joint and undisclosed checking account with Timberline Federal Credit Union on December 31, 2019.  (Def.'s Ex. 18.)

Cumulatively, the evidence would suggest otherwise, and it is more likely that the debtor did have additional unreported cash when he filed in February 2020.  A number of factors compel this result.  First, the debtor in his schedules did not disclose his checking accounts, the medium most likely to alert and provide his creditors a means of analyzing his financial and cash circumstances.  No good reason exists for this omission.

22

Second, the analysis above concerning the debtor's September through November 2019 account statements reflects significant income, mostly in the form of his severance pay. Contrasting that income with historical expenditures, consistent with those reported on his schedules, results in a discrepancy of between approximately ten to twelve thousand dollars for which there is no definitive accounting. The debtor suggested some vague and unquantified uses without any supporting documentation or convincing testimony.

Third, the debtor earned no income after his Georgia-Pacific pay, vacation, and severance deposits in the months of September to November 2019 until his pension commenced in April 2020. At trial, the debtor admitted that the severance pay was something that he was living on in that interim and that on February 7, 2020, he did have a little bit of cash. Based on his wife's minimal Social Security of $806 per month during that interim against expenses of approximately $4,200 a month, the resulting inference is that the debtor did have some cash available to bridge that period from the over $26,000 in cash withdrawals he made between September and November of 2019. If there is an explanation apropos to suggesting otherwise, the debtor did not provide one.

Fourth, the debtor completed his pre-bankruptcy credit counseling on October 13, 2019. (Pl.'s Ex. 17.) He also indicated that it had taken a long time to get everything together, so he went ahead and took the course. During this period, he was clearly aware of and contemplating filing bankruptcy. Approximately a week before his October 26 termination date, he knew that he would shortly receive his severance pay. The debtor testified that he knew in October of 2019 that he would have no income until April the following year and did not look for any other job or source of income because of his age and physical infirmities. So, in the Fall of 2019, the debtor was clearly aware that he would need money to live on from filing to April, the month his pension

23

started, and his only resource was the money he received from Georgia-Pacific. Aided by the debtor's candid admission in that regard, it is only a short leap to conclude that he retained some of the significant cash withdrawals to bridge that gap.

Fifth, during that same time period, the debtor was unquestionably aware that the Finishing Touch lawsuit had been set for trial on November 5. That setting was continued at his request, albeit for presumably valid reasons attendant to his attorney's health. Regardless, the creditor was pursuing the debtor at a time when the debtor received and cashed his final payouts from Georgia-Pacific.

Sixth, after a year of inactivity, the debtor also drew out the remaining balance of $1,037.32 in his 401(k) plan sometime between January 1 and March 31, 2020. At trial, the debtor was unable to recall what he did with that money. Standing alone, this event would not be that significant; but cumulatively, it is consistent with his pattern of denuding from his accounts all liquid assets prior to filing bankruptcy.

### 3. Pre-petition Transfers

At his section 341 meeting, the debtor told his Chapter 7 trustee under oath that he had not transferred property to anyone in the three years before his bankruptcy. Likewise, on his Statement of Financial Affairs, he indicated he had not in the two years prior to bankruptcy transferred any property other than in the ordinary course of his business or financial affairs. (Pl.'s Ex. 5, at 47.) Both statements are not consistent with his deposit of $40,000 from his 401(k) into his spouse's account at Timberline Federal Credit Union on October 17, 2018. (Pl.'s Ex. 14.) Less consequential than the transfer is the unwillingness to disclose the same. Equally, the transfer from a joint account to an individual account in his wife's name appears consistent with a pattern of removing from his name—and commensurately creditors—monies he received. Equally, the

debtor also failed to report on his schedules other miscellaneous yet unquantified supposed transfers by the debtor of cash to his wife's account.

### 4.  Misstating Income

Equally a puzzler is the debtor's treatment of his income on his schedules.  The debtor testified that his employer, Georgia-Pacific, forcibly retired him and that October 26, 2019, was his last day.  Despite being unemployed on the date he filed his petition, a status the debtor confirmed on his Schedule I where he checked the "[n]ot [e]mployed" box, the debtor listed monthly gross wages or salary of $4,867.46.  (Pl.'s Ex. 5, at 32.)  Additionally, he estimated overtime pay of $378.60 for a calculated gross monthly income of $5,246.06.  (Pl.'s Ex. 5, at 32.)  Deductions resulted in a monthly take-home pay of $3,270.39.  (Pl.'s Ex. 5, at 33.)  His non-filing spouse receives Social Security of $806 a month for an aggregate combined monthly income of $4,076.39.  (Pl.'s Ex. 5, at 33.)  On his schedules, the debtor indicated that he did not "expect an increase or decrease [of his income] within the year after [he] file[d] this form."  (Pl.'s Ex. 5, at 33.)

Except for disclosing that he was not employed and his spouse's Social Security income, all the above is incorrect.  He had no income when he filed and certainly had every belief that there was or would be a decrease within the year after he filed.  Succinctly, his Schedule I reflects a complete lack of attention to even bear minimum accuracy.  Perhaps the schedules were prepared earlier at a time when maybe the debtor was employed and contemplating a Chapter 13; but this nor any other explanation was offered for reporting nonexistent income.  The debtor did testify that he had filled out documentation before he got the Georgia-Pacific severance; there was delay occasioned by the fact that his attorney was ill.  But this testimony was in the context of the means test calculations.  Even if this excuse is extended to his Schedule I, intended to be an exact

representation of his current income, then clearly no effort was made to accurately complete the debtor's Schedule I.

## IV. Conclusion

Simply stated, when taken as a whole, the debtor's schedules simply reflect, at best, a consistent reckless indifference toward accuracy and disclosure. This includes the large ticket items discussed above down to the small things. For example, on his Statement of Financial Affairs, the debtor answered "[n]o" to the question of whether he had paid or transferred property to anyone, defined to include attorneys, that he consulted about filing his bankruptcy petition. (Pl.'s Ex. 5, at 47.) Then, the same exhibit contains a Disclosure of Compensation of Attorney for Debtor noting that he paid $1,500 to his counsel. (Pl.'s Ex. 5, at 56.) This seemingly minor incongruity is consistent with simply no attention to accuracy in these schedules.

In sum, the debtor did not have many assets, liabilities, or financial affairs to disclose; but what he did have he either omitted, misstated, or did so incorrectly. The only two places where the debtor was consistently accurate was in reporting those assets which he wished to exempt and those creditors he wished to discharge.

The specific and cumulative nature of the misleading, incorrect, and misstated schedules compels the conclusion that the debtor intentionally failed to accurately complete his schedules; alternatively, disclosures or omissions in some instances reflect a reckless indifference to the truth. Creditors and the trustee are entitled to information that the schedules are designed to elicit in order to analyze a debtor's financial circumstances with all the implications and consequences that may or may not arise. The debtor consistently denied his creditors and the trustee that opportunity. The lack of candor and disclosure (1) allowed the debtor to retain and use undisclosed cash and (2)

appears targeted at Finishing Touch, the only significant party adversely affected by the debtor's bankruptcy.

For these reasons, the relief requested in the Complaint is granted, and the debtor is denied his Chapter 7 discharge.  The court will enter a separate judgment to this effect.

IT IS SO ORDERED.

Dated this 1st day of December, 2020.


_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:    Jimmy Dean Kinney
       Billy J. Hubbell
       Robert Bynum Gibson, III
       M. Randy Rice
       Patricia J. Stanley, Assistant U.S. Trustee